The VISADOR CO., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 11080.

United States Court of Appeals
Fourth Circuit.

Argued May 31, 1967.

Decided Oct. 26, 1967.

Homer L. Deakins, Jr., Greenville, S. C. (Addington & McGraw, Jasper, Tex., and Thompson, Ogletree & Haynsworth, Greenville, S. C., on brief), for petitioner.

J. Richard Thesing, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., N.L.R.B., on brief), for respondent.

Before SOBELOFF, BRYAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The discharge of five employees, preceding and succeeding an unsuccessful union organizing campaign which had followed closely on the heels of two con-- sent elections in which employees rejected unionization, was determined by the Board to be a violation of § 8(a) (3) of the Act. Additionally, the discharge of the supervisor and coercive interrogations of employees about union affiliations, attitudes and activities and threats to reduce wages or move the plant because of union activities were found by the Board to be infractions of § 8(a) (1) of the Act. Appropriate remedies were ordered. On petition to review and set aside the Board's order, and cross-petition to enforce the order, we conclude to enforce part of the order directed toward the § 8(a) (1) violations and part of the order directed to the § 8(a) (3) violations, but to set aside the remainder thereof.

The Visador Co. ("petitioner") is a Texas partnership, engaged in the manufacture and sale of woodwork, at Jasper, Texas. Beginning in June, 1963, the union [1] began an organizational drive to become the bargaining representative of petitioner's production and maintenance employees. A consent election and a consent rerun election were held late in September, 1963, and early in December, 1963, respectively, but at each the union failed to receive a majority of the votes cast. Various alleged unfair labor practices stemming from these activities were settled by stipulation and an unpublished decree, enforcing the Board's order issued thereon, was entered by the United States Court of Appeals for the Fifth Circuit.

---

1. United Brotherhood of Carpenters and Joiners of America, AFL-CIO.

Beginning on or about July 27, 1964, a new union organizing campaign was started. Authorization cards were signed and meetings held; and, on August 7, 1964, the union requested recognition as the bargaining representative of the employees. Petitioner refused recognition, but further steps to require bargaining were not pressed.[2]

The employees whose discharge was found to violate § 8(a) (3) were: W. B. Roberts, who was discharged July 9, 1964; Carl Forward, who was discharged November 4, 1964; James Edward Williams, who was discharged November 4, 1964; Joe W. Low, who was discharged January 4, 1965; and Cledis C. Weatherford, who was discharged January 4, 1965, reinstated January 6, 1965, and discharged a second time on May 31, 1965. The § 8(a) (1) violations were found to have occurred (a) when Supervisor Gordon Pendergast, Jr. was discharged January 26, 1965, and (b) by certain interrogations, warnings and threats made on various dates, to which more specific reference is made hereafter.

### The § 8(a) (3) Violations

■ The rules of law by which the correctness of the Board's determinations and order are to be determined are not complex. If supported by substantial evidence contained in the record considered as a whole, the Board's findings must be sustained and relief predicated thereon enforced. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Specifically with regard to the § 8(a) (3) violations, we need refer only to Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed. 2d 827 (1965); American Ship Bldg. Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) and N.L. R.B. v. Great Dane Trailers, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027

(1967). These last three cited authorities stand for the proposition that the question of whether an employer has violated § 8(a) (3) normally turns on an employer motivation. With the exception of certain discriminatory conduct which is inherently destructive of important employee rights, proof of an anti-union motivation is needed to establish a violation if the employer has come forward with evidence of legitimate and substantial business justification for its action. If an employer's conduct is inherently destructive of important employee rights, proof of anti-union motivation is not required, and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. In each case the issue is largely factual, and so we turn to a consideration of the facts surrounding the discharge of each of the employees in question.

### A—The Discharge of Roberts

■ During the first unsuccessful campaign of the union there had been few more opposed to its drive for recognition than Roberts. During that time he served as a company source of information concerning union activities. For a reason which the record does not fully disclose, but which was probably outraged sensibilities at what he considered unfair criticism of a fellow-employee, Roberts, sometime in 1964, reversed his position; and, some ten days prior to his discharge, communicated his change of heart to Plant Superintendent Davis. Based on this evidence and some general statements by company foremen that Roberts was a "good employee," the examiner determined that " * * * Roberts was terminated for having announced to Davis that henceforth he would not continue his fight against the Union."

The record discloses that Roberts was a primary instigator of racial discord be-

**2.** Although in the instant proceeding petitioner was initially charged with violation of § 8(a) (5) of the Act for failure to bargain, these charges were dismissed on the motion of General Counsel at the hearing. See also § 9(e) (2) of the Act, which would have prohibited another election within the 12-month period succeeding the last election.

tween white and Negro employees. He was a principal exponent, if not the originator, of an oft-repeated and scurrilous jingle expressed to white employees that they should work with vigor or be replaced by a Negro. Additionally, Roberts was quite vocal in his criticism of a recently appointed foreman. The record is replete with evidence of Roberts' persistence in both of these courses of objectionable conduct.

Petitioner sought to sustain Roberts' discharge on these grounds. We think that petitioner amply demonstrated that it had good grounds for Roberts' discharge and, negatively, it had no anti-union motivation because Roberts was replaced by Joe Clark, also active in the union movement—indeed, one whom the Trial Examiner characterized as "one of the mainsprings of the 1964 campaign" —and Roberts was discharged on July 9, 1964, almost three weeks before the union's second campaign began. The portion of the Board's order requiring reinstatement and backpay is set aside and enforcement denied.

### B—*The Discharge of Forward*

Forward was employed on the day shift in the miter saw department. Petitioner's manufacturing operation has seasonal characteristics, and Forward was laid off for approximately one month in January, 1964, with no claim that petitioner had violated the Act. Forward was the last employee to be eliminated in the miter saw department in November, 1964, and prior to his discharge, other employees had been laid off or transferred because of the decline in work in the department.

The Trial Examiner found that the discharge of Forward was ordered by Superintendent Davis over the protest of Foreman Pendergast, and that the motivating factor in the discharge was Forward's role as one of the key organizers in the union campaign in August. The extent of Forward's union activities, as disclosed by the record, was that he had signed a union card and had persuaded three other employees to sign such cards

more than two months prior to his discharge.

When considered as a whole, the record shows that Forward was an extremely garrulous individual and constantly wandered through the miter saw department distracting other employees and engaging them in lengthy conversations. Forward himself admitted that he talked too much.

There was no evidence that Forward was a key figure in union activity at the time of his dismissal, because evidence that he continued his union support after mid-August, when the card-signing drive ended, was lacking. Additionally, the record is far from clear that Superintendent Davis knew, prior to the date of discharge, that Forward supported the union. Davis had been told by Pendergast that Forward, having been warned that his work was sub-standard and his talking too frequent, had threatened to bring unfair labor practice charges in the event he was fired.

While the Trial Examiner found that "Forward was considered by Foreman Pendergast to be one of his better employees" and that "Pendergast testified that he had just one employee equal to Forward," our reading of Pendergast's testimony makes clear that what he said was that he considered Forward better than most of the other men who were laid off or discharged prior to November 4, 1964, the date of Forward's discharge, but that no comparison was made to other employees who were retained in that portion of petitioner's operation.

We conclude, in regard to Forward, that there was economic justification for his discharge, because he was an unsatisfactory employee, and that a finding of anti-union motivation cannot be sustained when the record is considered as a whole. Because the Board's order in regard to Forward is not supported by substantial evidence, it will be set aside.

### C—*The Discharge of Williams*

Williams, an employee on the night shift, was discharged at a time that he had the most seniority and the

highest wage of any worker on that shift. On several occasions just prior to his discharge he had strongly indicated to supervisory personnel his belief that a union would prevent what he thought was discriminatory discharge of another employee.

Admittedly, there was some evidence that Williams was not a satisfactory employee but, unlike Forward, the evidence of petitioner's knowledge of Williams' pro-union position was stronger, and that of his unsatisfactory work performance weaker and controverted. We conclude that the Board's findings and order with regard to Williams should be enforced.

D—*The Discharge of Low and Weatherford*

The first discharge of Weatherford occurred as part of the discharge of Low, and the two may be considered together. Both were discharged on January 4, 1965, but reinstated at the instance of petitioner's managing partner on January 6. The circumstances surrounding their discharge follow:

On December 23, 1964, Weatherford and Low, who had been members of the union's organizing committee, helped to circulate a petition among employees requesting a full holiday on December 24, rather than the half-day holiday normally allowed. The object of the petition was not accomplished. During working hours the next day, Low struck his back on a saw table and caused a cyst in his back to begin draining. He asked for medical leave, which was granted by Foreman Pendergast, and Pendergast designated Weatherford to drive Low to a doctor. In dispute was whether Pendergast advised them of petitioner's rule that Low's disability required either to go to a doctor in a nearby town or check out; hence, the Trial Examiner's finding that Pendergast did not is supported by substantial evidence. Weatherford took Low to the latter's doctor, some distance from the plant, and neither of them checked out.

When work was resumed after the Christmas holidays, Low and Weatherford were discharged for not following the company rule. The discharge was effected by Pendergast, who claimed that Foster, the manufacturing department head, put pressure on Pendergast to discharge them, even though Foster advised Pendergast " * * * that is your decision to make. I am not going to tell you to fire them."

As Low and Weatherford were leaving the plant, they saw Robert J. Hall, petitioner's managing partner. They advised Hall what had occurred and he promised to investigate. The record shows that during the next two days discussions were held between Hall, Pendergast and Foster, which culminated in the rehiring of Low and Weatherford on January 6, 1965.

While the Trial Examiner found that Low and Weatherford were discharged for circulating the petition asking for a full holiday on Christmas Eve, and that this was the "straw that broke the camel's back," thus intimating that Low and Weatherford had been under surveillance because of past union activities. We conclude that these findings cannot be supported. The record shows that all union activity had ceased in August with the denial of the request for recognition. The record shows, further, that there was an apparent misunderstanding as to whether Weatherford and Low knew of the company rule about absences for medical care and an overwillingness on the part of Pendergast to do what he thought (erroneously as subsequent events disclosed) would be well received by his superiors. Certainly, when Hall obtained knowledge of the incident he made an immediate investigation and directed their reinstatement. That there was a good faith effort to rectify a mistake cannot be doubted. In fact, petitioner informed General Counsel on January 5 of the events, offered an explanation, and assured both the Board and the union that there was no anti-union

motivation in what had happened.[3] We find no anti-union motivation or interference with concerted § 7 activity, and we decline to enforce this portion of the Board's order.

### E—*Weatherford's Second Discharge*

After his return to work, Weatherford was again discharged on March 31 for using profane language imputing canine ancestry to his foreman. Weatherford admitted the use of the language, but defended on the ground that it was his spontaneous response to the culmination of persistent harassments perpetrated by Foreman Parker in retaliation for Weatherford's union activities.

The alleged persistent harassments consisted of the complaint that when work schedules were changed, Weatherford was placed on a different schedule than his riders, and the complaint that a saw had been placed next to Weatherford's work space in such a way that he could not reach his machine without climbing under a table. Both of the alleged harassments were insubstantial. The evidence disclosed that the saw had been so placed by maintenance employees in order to give it access to a suction pipe outlet. An employer is not obliged to fix work schedules to accommodate employees' private arrangements for car pooling.

The incident which culminated in Weatherford's discharge began when he left his work station to go to another department. While the record discloses a conflict in whether his initial purpose was business or otherwise, the record is clear that when Foreman Parker first noticed Weatherford off of the job, Weatherford was engaged in a purely personal conversation with two men from another department, which, Weatherford admitted, he should not have been doing at that time. When Parker directed Weatherford to return to his work station in peremptory language an argu-

ment ensued, during which Weatherford used the language which Parker testified to as the cause of the discharge and offered to engage the foreman in a fist fight.

The finding of the Trial Examiner that the discharge violated § 8(a) (3) was premised on the determination that Weatherford's insubordination was precipitated by petitioner's harassment and served as a pretext for Weatherford's discharge. This conclusion was premised on the finding that Parker, Weatherford's foreman, became " * * * less and less receptive and certain differences between the two then started and continued to grow," *after petitioner became aware that Weatherford was a union supporter.* We do not find foundation for the premise or substantial evidence to support the conclusion.

At the outset, we note that the Trial Examiner's finding that Weatherford's union activity was well-known in November, 1964, made in connection with *his first discharge, is inconsistent with* his finding that animosity between Weatherford and Parker arose only after Weatherford's union proclivities were known, because Parker did not become Weatherford's foreman until after January 26, 1965. There is no evidence to show that union activity was a cause of hostility between these two. At most, the record shows personality clashes between Parker and Weatherford, totally unrelated to union activity. Anti-union motivation, therefore, did not exist, and there is no dispute that, absent justification, Weatherford was insubordinate. We decline enforcement of this portion of the Board's order.

### The § 8(a) (1) Violations

The claimed § 8(a) (1) violations are two-fold in nature. The first is the discharge of Foreman Pendergast, and the second certain coercive interrogations,

---

**3.** General Counsel and the union both agreed that the two-day discharge would not be asserted as an unfair labor practice. Notwithstanding their agreement, an unfair labor practice was charged and pressed, successfully, before the Trial Examiner and the Board.

promises and threats made to employees relating to union activities.

## A—*The Discharge of Pendergast*

Admittedly, Pendergast was a supervisor, so that his discharge on January 26, 1965 as such constituted no violation of the Act. §§ 2(3), 2(11) and 14 of the Act. The Trial Examiner and the Board, however, determined that his discharge violated § 8(a) (1) of the Act, because it interfered with employee rights. Their theory was that Pendergast had hesitated or refused to participate in the first discharge of Weatherford, and the discharges of Roberts, Forward and Low, all of which the Board found to violate § 8(a) (3), that Pendergast was clearly pro-union and was discharged the moment he articulated his views, and that the employees knew of Pendergast's pro-union sympathies and, hence, were intimidated from engaging in protected activities by the discharge.

Taken as a whole, the record supports none of these findings. We have concluded that the first discharge of Weatherford, and the discharge of Roberts, Forward and Low were not in violation of § 8(a) (3); Pendergast's role in them is thus irrelevant. While it is true that Pendergast was discharged shortly after he specifically announced his pro-union sentiments, these were apparent long before that time and petitioner's prolonged tolerance, i. e., its failure to act sooner, destroys the inference that they were the real cause for his discharge. While Oil City Brass Works v. N. L. R. B., 357 F.2d 466 (5 Cir. 1966) (dictum), suggests that employee knowledge of the reasons for a supervisor's discharge is not a necessary link in a chain of proof establishing employee coercion, General Engineering, Inc. v. N. L. R. B., 311 F.2d 570 (9 Cir. 1962), holds to the contrary; and there is no evidence in this record to show that the employees knew of Pendergast's specific declaration of his position.

■ We find it unnecessary, however, to decide this issue, because the record contains abundant evidence to warrant Pendergast's discharge for reasons having nothing to do with his pro-union sympathies. The record discloses that Pendergast was a young foreman, often hesitant and inconclusive, unwilling to take or handle responsibility, who, on numerous occasions, in addition to those selected by the Board, refused or hesitated to discharge employees on the suggestion of his superiors, where discharges for non-invidious reasons were clearly indicated. This ambivalence may have stemmed from friendships developed by Pendergast as a non-supervisory employee, but it does not necessitate the conclusion, as the Trial Examiner seemed to believe, that a discharge for this lack of fortitude impinged on employee § 7 rights. Indeed, the discharge of Weatherford and Low, which occurred approximately three weeks before, may have been Pendergast's over-zealous attempt to show how firm he was. Fortunately, intervention by the managing partner corrected Pendergast's excesses, but the incident was enough to convince Pendergast's supervisors that he lacked the maturity and balance necessary to be a foreman.

Petitioner advanced as its reasons for Pendergast's discharge that he showed favoritism to some of his employees, that he had received an unfavorable report on an opinion survey taken among the employees, that he had not turned in a requested report on his job for at least three weeks, that he had a lot of bad material in his department, and that he had failed to turn in accident reports. Pendergast controverted only the last two reasons assigned. It is unnecessary for us, however, to analyze the validity of all of the reasons. It suffices that the record, taken as a whole, demonstrates that there was substantial economic justification for Pendergast's discharge, and that intimidation of the rights of employees was not established by substantial evidence.

## B—*Interrogation and Threats*

■ Numerous instances of coercive interrogation and threats made by petitioner's supervisory employees and those

clothed with apparent authority to speak for petitioner were also relied on by the Trial Examiner and the Board to support the conclusion that § 8(a) (1) violations had occurred. We need not detail each instance, because we are satisfied from our examination of the record as a whole that at least some of the interrogations were coercive, and that threats of dire economic consequence because of union activities were made. We will enforce this part of the Board's order.

Enforcement granted in part and denied in part.