## FIRESTONE TIRE & RUBBER COMPANY, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

### No. 77–1468.

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1978.

Decided Sept. 19, 1978.

John S. Hoff, Washington, D. C. (George LeMaistre, Jr., Leva, Hawes, Symington, Martin & Oppeheimer, Washington, D. C., Walter B. Connolly, Jr., Asst. Counsel, Akron, Ohio, on brief), for petitioner.

Fred Havard, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Michael S. Winer, Atty., Washington, D. C., on brief), for respondent.

Before WINTER, RUSSELL and HALL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The petitioner Firestone Tire & Rubber Company seeks to set aside a decision and order of the respondent National Labor Relations Board [1] finding the petitioner had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by suspending David R. Stafford on July 28, 1975, for two days and six hours and ordering both the rescission of such suspension and back pay. The Board has cross-petitioned for enforcement of its order.[2]

We deny enforcement.

Stafford was suspended on the afternoon of July 28, 1975. He and a fellow employee Perry were working at the time as oilers on the afternoon shift (i. e., from 3 to 11 o'clock at night) in the Mechanical Department of petitioner's Wyandotte, Michigan plant. One of the machines in the depart-

1. Reported at 228 NLRB No. 117.

2. The order of the Board also found that the petitioner had, through one of its counsel, interfered with its employees "in the exercise of rights guaranteed them in Section 7 of the Act." This position of the Board's order is not challenged by the petitioner and will be enforced.

ment developed a substantial oil leak. The leak was at such a rate that a 55-gallon drum put under the leak had quickly filled and was overflowing onto the floor. The petitioner's safety inspector noticed the condition and instructed the supervisor in the area, Allarie, to see that the condition was promptly remedied. Allarie went to the site of the trouble, saw the leak and observed the oil overflowing from the drum onto the floor. He concluded that an oiler, whose responsibility it was to grease, oil and lubricate the machinery, was needed to correct the situation.

He observed Stafford in the vicinity of the trouble and assigned him to the urgent task of correcting both the leak and the overflow, instructing him first to remove the overflowing drum and replace it with an empty one. Stafford responded with a procession of dilatory excuses against undertaking the assignment. He demanded the job be assigned to the other oiler on the job because the latter was his junior. He added, also, that he couldn't move the barrel because of his weak back. Allarie replied, "[d]on't bother moving it. Get a pump and pump it [the oil] back into the machine." Stafford's account is that at this point, he said, "I would do this, but I could not get the pump near the press for there were many rims piled there and I could not get into that area." Allarie responded by telling Stafford he would have the rims moved and directing him to bring the pump to the site of the trouble. Stafford indicated he would carry out such direction and went off.

Stafford did not, however, go after the pump. Instead he went to the office of the union chief steward on duty to complain of his assignment. When Allarie later returned to the site of the trouble to see what progress was being made, he found that there was no pump and no Stafford anywhere to be seen. He began to look for Stafford and discovered him in the office of the union chief steward, having completely abandoned for the time-being his assignment. Allarie, apparently with some exasperation, asked the latter "are you going to get on that job?" Stafford replied by commenting, "[w]ell, Bob, when you get the rims moved I'd gladly do it." At this point Allarie expressly instructed Stafford, without taking notice of the possible impertinence of Stafford's comment, "I want you to take the pump, get it down on the line, and get it ready to go to work." Obviously the rims were no impediment to the task Allarie had instructed him to carry out, i. e., to get the pump and bring it to the site so as to expedite the correction of the condition and to avoid any delay resulting from going for the pump after the rims had been removed. Stafford, however, demurred about going for the pump, as he had about every other instruction that had been given him, stating, "[w]hy not wait until they [the rims] are moved?" Allarie then repeated for the third time his instruction to "[g]et the rig [the pump] ready now so that you can start." [3]

Despite these plain, repeated instructions to get the pump and to bring it to the place where the trouble was, Stafford, as soon as he got the pump, noticed that it was his break time (5:30). He immediately abandoned the pump, got a soft drink and returned to the union office for his rest break. He justified the abandonment of his task on the ground that his regular break period was from 5:30 to 5:40. It was the general rule, however known to Stafford and testified to by a union official that, if there were an emergency situation, an oiler was not to abandon dealing with that situation but should defer his break until the emergency was under control. Stafford must have considered this was an emergency situation for he filed *after his suspension* an OSHA complaint that the situation had created an extremely hazardous safety condition. As an experienced oiler, he must have known too that the condition of the machine was causing a loss of production. Yet, as we have noted, he calmly abandoned his assigned task, *a task first assigned him a considerable time before he determined to take his break.*

3. This account of events is taken from Stafford's own testimony.

In the meantime Allarie was assisting in removing the rims. Having observed that Stafford had not brought the pump, he began looking for Stafford. Again he found Stafford leaving the union office. At this point and under these circumstances, Allarie told him "[y]ou are suspended." [4] Later, when Stafford brought his shop steward to the site and complained in the presence of the steward the suspension, Allarie explained his action in suspending Stafford thus: "I told the man [meaning Stafford] to get on the job and do a job; he refused to do it; I am sending him home." When this action of Allarie was reviewed by petitioner's Manager for Industrial Relations, Stafford's suspension was fixed at two days and six hours. Such are the circumstances of Stafford's short suspension.

Under the circumstances there can be no denying that Stafford had given every justification for disciplinary action. We have often held that insubordination and refusal to obey instructions constitute reasonable grounds for disciplining an employee. *N.L.R.B. v. Consolidated D. Elec. Co., Div. of C. Corp.* (4th Cir. 1972) 469 F.2d 1016, 1025; *Visador v. N.L.R.B.* (4th Cir. 1967) 386 F.2d 276, 281; *N.L.R.B. v. Wix Corporation* (4th Cir. 1962) 309 F.2d 826, 833. Stafford in this case did not simply refuse to obey instructions and to perform an assigned task; he persevered in such refusal over a considerable period of time despite the fact that the instruction was repeated to him on three separate occasions during that time and even though he had far more than ample time to carry out his instruction. There can be no clearer showing of insubordination and refusal to obey instruction that this record makes out. In the face of this continued refusal by Stafford to do his repeatedly assigned task, Allarie acted with great restraint and considerable patience in deferring as long as he did in taking some disciplinary action. Stafford's attitude

from the beginning to the end was contumacious, provocative and, even in some respects, insolent. If his own story is to be fully accepted, he dallied and dawdled to the point of exasperation in carrying out his assigned task and sought to raise every obstacle that he could to performing the assignment given him. We repeat, the remarkable thing about the whole affair is the patience with which Allarie so long treated Stafford's insubordination and the relatively mild discipline finally given him for such insubordination.

The Board, however, would find that the justification assigned by Allarie for the suspension was pretextual and a mere cover for a subtle intention of disciplining Stafford for his militant discharge of his duties as the Union's safety representative in the plant. As a matter of fact, the Administrative Law Judge, whose findings were affirmed by the Board, attempts to give a discriminatory coloring to the suspension by tieing the suspension to a safety complaint made by Stafford on the 28th with this express finding: "Confronted on July 28 with yet another safety complaint from Stafford, the Company reacted with a real show of strength, a suspension." However, the safety factor connected with the leaking machine was raised, not by Stafford, but by petitioner's own safety inspector and was raised apparently without even the knowledge of Stafford. Stafford never had anything to do with the leaking machine until the petitioner through its own safety inspector had instructed corrective steps to be taken and Stafford was called to the site and instructed to aid in correcting the condition. This is undisputed in the record. Thus, Stafford never "confronted" the petitioner with a safety complaint on July 28, the date he was suspended, as the Administrative Law Judge specifically found as at least a partial basis for his discriminatory conclusion. It was only after his suspension

---

4. The Administrative Law Judge and the Board find significant that when Allarie wrote out the suspension slip, he fixed the time as 5:30, but later when Stafford charged it was 5:38, changed the time to 5:40. We fail to find any significance in this incident and we regard the change unimportant. Moreover, neither the Administrative Law Judge nor the Board suggests how it would be significant on the issue of discriminatory suspension whether Allarie gave the time of suspension as 5:30 or 5:40.

that he filed a safety complaint with OSHA, a complaint which incidentally OSHA dismissed as without any merit. It would seem that the Administrative Law Judge must have been somewhat confused about the facts surrounding Stafford's suspension and erroneously thought that the latter's suspension occurred when he "confronted" Allarie with an assumed safety complaint, an assumed safety complaint which was never made.

The Administrative Law Judge also stated as a basis for his discriminatory conclusion that Stafford never "refused to perform a work assignment," concluding from this that "the stated reason for Stafford's suspension is not borne out by the facts." This the Administrative Law Judge finds warrants his conclusion that the petitioner's justification for the suspension was pretextual and discriminatory. It may be that Stafford never "refused" in express words to perform his work assignment but his actions spoke louder than mere words. He demonstrated throughout a conscious and deliberate refusal to carry out instructions. He unquestionably objected to the assignment itself from the outset. While he finally gave Allarie the impression he was going to perform his assignment, he did not pretend to perform his assigned duty. As soon as Allarie was gone he abandoned the task and went over to the union office to complain and to object to the assignment, an objection which incidentally the union maintenance steward at the plant characterized as "frivolous." This conduct hardly comports with a finding that Stafford did not refuse to perform an assignment. And, when Allarie finally found him at the union office and inquired why he was not carrying out his assigned task of getting the pump, Stafford tells Allarie, in terms that could be regarded as insolent, that he will perform his assignment when Allarie removes the rims. If Allarie had not been attempting to show every consideration to Stafford, he would have suspended him then and there for inexcusable insolence and insubordination. It was only later, though, after Stafford had *repeatedly* failed to carry out instructions to bring the pump to the site of the trouble that Allarie finally suspended him. The finding of the Administrative Law Judge that Stafford never "refused to perform a work assignment" is clearly not supported by substantial evidence. Yet it is a primary finding on which the Administrative Law Judge predicated his ultimate finding of a discriminatory suspension.

The Administrative Law Judge cites another incident in support of his conclusion. A witness, who had an admitted grudge against Allarie and who was suing the petitioner for allegedly causing him to suffer severe psychiatric problems requiring continuous psychiatric treatment, is quoted in the Administrative Law Judge's findings as having overheard Allarie reporting to his superior on his suspension of Stafford as follows: "I have no alternative but to give Dave Stafford time off. I want to let him know that OSHA don't run the place, we do." The witness was not clear about the time he heard this and he could testify to nothing else that was said. That Allarie would have made any such statement in connection with the suspension on July 28 seems so unlikely as to be incredible. Stafford had raised no safety complaint with Allarie on July 28; he had made no threat to go to OSHA; he was simply following a calculated strategy of refusing to undertake an assignment he found unwelcome. The only person to raise a safety issue was Angebrandt, the petitioner's own safety inspector. Stafford had nothing to do with this complaint. It would have been without any basis whatsoever for Allarie to have said that he was suspending Stafford because of an OSHA complaint made by Stafford on that occasion. This incredible conversation, however, may have been responsible for the Administrative Law Judge's error in finding that Allarie had been "confronted" with a safety complaint by Stafford on July 28, to which we have earlier referred. But we emphasize the record shows there was no such complaint and there wasn't any such confrontation. It is simply inconceivable that Allarie could have been justifying his action in suspending

Stafford on a safety complaint by Stafford that Stafford himself never claimed occurred and a confrontation that never occurred.

The Board in turn approved the Administrative Law Judge's findings. It added to such findings the statement "that of six employees on the union safety committee, Stafford was the only militant." From this it would deduce that Stafford had become a target of employer hostility. There is nothing, however, to support this conclusion. Stafford admitted he did not know what the other safety representatives did. He did testify that he knew of one who had been criticized, as he said, for excessive complaints. There is thus no basis whatsoever in the record for a finding that Stafford "was the only militant." The Board added, also, that, under its construction of the time sequence, it was evident that the rims about the leaking machine were not fully removed "until after 5:45" and the suspension was made at 5:40. From this it deduces that Stafford was not tardy or dilatory in carrying out his assigned task. Apparently the Board is assuming that the task that Stafford had not performed was the removal of the oil from the drum and that he could not have performed this task at the time he was suspended because the rims had not been removed. The Board has, however, clearly misread the record. The task that Stafford had mocked with his dilatory tactics for a considerable time was the one given Stafford before he first went to the union office, and repeated to him twice thereafter, i. e., that he get the pump and bring it to the place of the trouble so that, when the rims were removed, pumping could begin promptly. The Board, thus, has not bulwarked the faulty findings of the Administrative Law Judge with any other findings with a substantial basis in the record.

Moreover, the Administrative Law Judge and the Board did not even notice the fact that Stafford filed a grievance under the collective bargaining agreement on account of this suspension or that the union denied it and refused to take the grievance to arbitration. Stafford suggests that the union refused to pursue the grievance because it feared that any action on his claim might disrupt the union's "harmonious" relationship with the petitioner.[5] If the relationship of the union and the petitioner has been "harmonious" such fact should be taken as a rather strong indication that the petitioner has not sought to penalize any employee either for belonging to the union or for performing any of the responsibilities of a union officer; it certainly does not justify a suggestion, even indirectly, that the United Auto Workers was not zealous in asserting aggressively the rights of its members. It is of interest, too, that both the Administrative Law Judge and the Board take no note of the testimony of two witnesses called by the General Counsel. Harold Mink, the union maintenance steward on Stafford's shift, testified as a witness for the General Counsel that Allarie had previously complained to him that Stafford would not follow instructions. This same witness, who had unquestioned opportunity to make a detached evaluation of Allarie's conduct toward Stafford, testified that he had no reason to disbelieve that Stafford was suspended for refusing to do his job. Perhaps this is the real reason the union would not assert a claim of discrimination on Stafford's behalf; i. e., that it didn't believe Stafford had been treated discriminatorily. Moreover, Stafford's fellow oiler on the afternoon shift complained that Stafford was favored in assignments by Allarie. This doesn't suggest that Allarie was hostile to Stafford or was seeking to find a pretext to discipline him. Yet the Board gives no explanation of its failure either to take note or to give any weight to

5. This idea that there were "harmonious" relations between the union and the petitioner is contradictory of the suggestion by Stafford that he was afraid of losing his job from "the first day [he] pinned a union badge on in that plant," a statement that could only be taken as

charging that the petitioner was hostile to the union. Moreover, there is not a scintilla of evidence that the petitioner had shown any hostility to the union or had harassed union members or attempted to interfere in any way with union activity.

these significant circumstances which were directly related to the claim of a pretextual suspension.

On this record, the Board has failed to establish by substantial evidence a violation of the Act in the mild suspension of Stafford. We have said many times that when the employer has a valid reason for disciplining an employee (which it unquestionably had in this case) "it is not sufficient to establish a violation of the Act for the Board to declare that the [suspension] was 'pretextual,'" but "'the burden which is on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one,'" *Firestone Tire & Rubber Co. v. N.L.R.B.* (4th Cir. 1976) 539 F.2d 1335, 1337, and to "'present a substantial basis of believable evidence pointing toward the unlawful one,'" *N.L.R.B. v. Consolidated D. Elec. Co., Div. of C. Corp., supra*, at 1025 (469 F.2d).

Neither the Administrative Law Judge nor the Board had "a substantial basis of believable evidence" in support of a finding of a discriminatory suspension in this case. There was nothing unusual about Stafford's suspension under the circumstances. The petitioner introduced into the record a list of employees who had been similarly disciplined. There were other safety representatives in the plant, both before and after his suspension. Not one of them had before or has since complained of unfair treatment because of the discharge of their union duties, so far as this record shows. As we have already observed, there is no credible evidence that Stafford was any more vigilant in the discharge of his union responsibilities than the others who had served in that capacity. Moreover, the admitted "harmonious" relationship between the petitioner and the union—a harmony noted by the Board itself—attests to the fact that neither the petitioner nor its supervisors had a record of disciplining employees either for union membership or for the performance of any of their union duties, a fact which the Court in *Neptune Water Meter Co. v. N.L.R.B.* (4th Cir. 1977) 551

F.2d 568, noted and used to distinguish that case from *Firestone* (539 F.2d 1335).

Both the Administrative Law Judge and the Board proceeded on a mistaken assumption of the record: The Administrative Law Judge upon the assumption that the confrontation between Allarie and Stafford arose out of a safety complaint made by Stafford rather than out of a work assignment given Stafford by Allarie to which Stafford objected and in connection with which Stafford failed to carry out instructions; the Board in assuming that the suspension was imposed because Stafford did not pump out the leaked oil rather than because he refused to bring promptly to the site of the trouble the pump as he was repeatedly instructed to do over a considerable period of time.

Enforcement of the Board's order rescinding the suspension of the employee Stafford and ordering back pay in his favor is accordingly denied. All other provisions of the Board's order are enforced without objection by the petitioner.