658 F.2d 968
 108 L.R.R.M. (BNA) 2177, 92 Lab.Cas. P 13,015
 The PROCTER & GAMBLE MANUFACTURING COMPANY, Port Ivory, New
York Plant; Kansas City, Kansas Plant; Dallas,
Texas Plant; Baltimore, Maryland Plant,
Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 80-1275.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 4, 1980.
Decided Sept. 4, 1981.
 
 Guy Farmer, Washington, D. C. (Farmer, Wells, McGuinn, Flood & Sibal, Washington, D. C., Harry L. Browne, James G. Baker, Spencer, Fane, Britt & Browne, Kansas City, Mo., Harold S. Freeman, Gregory L. Hellrung, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, on brief), for petitioners.
 R. Michael Smith, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief), for respondent.
 Before HAYNSWORTH and FIELD, Senior Circuit Judges, and PHILLIPS, Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 This case is before us upon the petition of Procter & Gamble Manufacturing Company (Procter & Gamble) to review and set aside a decision and order of the National Labor Relations Board (Board) and upon the Board's cross-application for enforcement of its order. Procter & Gamble Manufacturing Co., 248 N.L.R.B. No. 119 (Apr. 4, 1980).
 
 
 2
 Procter & Gamble is a national manufacturer with its headquarters in Cincinnati, Ohio. This case involves four Procter & Gamble plants Port Ivory, New York, Kansas City, Kansas, Dallas, Texas, and Baltimore, Maryland and the four independent unions representing employees at these plants.[1] The four unions eventually want to bargain with Procter & Gamble on a multiplant basis.[2] As a step towards this goal, each union, during its collective bargaining agreement's renewal negotiations in 1976 or 1977, attempted to include members of the other three unions on its bargaining committee. Procter & Gamble clearly is opposed to multiplant bargaining and, therefore, it sought to discourage the participation of such "outsiders"[3] in the negotiations.
 
 
 3
 The unions filed charges with their respective regional Board offices, alleging that Procter & Gamble committed numerous unfair labor practices during the 1976-77 contract renewal cycle. The charges were transferred to the Brooklyn, New York Regional Office, complaints issued, and the cases consolidated before an Administrative Law Judge (ALJ). The ALJ concluded that Procter & Gamble violated subsections 8(a)(1), (3), and (5) of the Act, 29 U.S.C. § 158(a)(1), (3), (5), by engaging in a concerted course of conduct at all four plants which effectively foreclosed the unions' selected outside bargaining representatives from participating in the contract negotiations. He also found unfair labor practices at individual plants. Procter & Gamble Manufacturing Co., No. JD-608-79 (Aug. 31, 1979) (appended to 248 N.L.R.B. No. 119) (Jt.App. at 980). The Board affirmed the ALJ's rulings, findings, and conclusions and adopted his recommended order with slight modification. 248 N.L.R.B. No. 119 (Jt.App. at 1094).
 
 
 4
 In its petition to this court, Procter & Gamble raises four major objections: (1) the Board erred in finding any unfair labor practices; (2) several allegations are barred by the six-month limitation in subsection 10(b) of the Act, 29 U.S.C. § 160(b); (3) the Board erred in issuing one decision and order for the four distinct plants and unions when there was no single consolidated complaint; and (4) the Board's conclusions, order and notice are too broad. We consider these objections in order and, for the reasons that follow, we find them without merit. Accordingly, except for that portion of the Board's order directing Procter & Gamble to sign the now expired 1977 Kansas City agreement, we grant enforcement.I
 
 
 5
 The following facts are supported by substantial evidence on the record. Each of the unions involved in this case is an independent labor organization and the recognized bargaining representative for the employees at its respective plant. For numerous years, each union has negotiated and executed collective bargaining agreements for its unit. Before 1976-77, each union was represented at contract negotiations by a bargaining committee composed solely of its members, although the union's attorney occasionally attended the bargaining sessions too. Negotiations were held at the plant and Procter & Gamble paid the employee negotiators for the work time they lost while in negotiations.
 
 
 6
 In 1968, several independent unions representing Procter & Gamble employees formed an "Amalgamation," which by 1971 consisted only of the four unions in this case.[4] One of the Amalgamation's aims is to establish a multiplant bargaining unit. At the Amalgamation's September 1975 meeting, the four unions decided to further this goal by including the outsiders on their bargaining teams during the upcoming contract renewal negotiations. This was, however, the only contemplated change in bargaining procedure. The Amalgamation's proposed plan was published in the Port Ivory union's October 7, 1975 bulletin; thus by early 1976, Procter & Gamble was alerted to the unions' plan.
 
 
 7
 The four contracts expired on different dates. Renewal negotiations accordingly began at Port Ivory on October 6, 1976, at Kansas City on January 9, 1977, at Dallas on March 25, 1977, and at Baltimore on July 18, 1977. Upon learning of the unions' plan to include outsiders, Procter & Gamble management at each plant responded in a nearly identical manner shortly before negotiations were to begin. Initially management asserted that negotiations could not be held on the plant premises because each plant had a security, or access, rule which restricted any visitors, including employees from other Procter & Gamble plants, from entering the plant except on a guided tour. Management then suggested that, as an accommodation to the union's insistence upon including outsiders, the negotiations could be held at alternative facilities, such as local motels, with the parties sharing the rental costs. In addition, Procter & Gamble would no longer pay local employee negotiators. Each union protested these changes but, because its contract was due to expire, the union eventually negotiated with Procter & Gamble under these forced conditions.
 
 
 8
 Each union managed to include three outsiders on its team for the opening negotiation session. The outsiders were introduced as members of the union's bargaining committee present to negotiate a contract for only that union. In each case management, using a series of prepared written questions furnished by Procter & Gamble's industrial relations department at its Cincinnati headquarters, then asked the outsiders about their role and purpose in participating in the negotiations.[5]
 
 
 9
 The Port Ivory renewal negotiations serve as a detailed example of Procter & Gamble's concerted opposition to the outsiders. When the division manager, Philip Robinson, learned that the Port Ivory union intended to include outsiders, he consulted with Bob Larsen, a member of Procter & Gamble's industrial relations staff in Cincinnati, about the union's plan. Larsen informed Robinson that legally the union could select whomever it wanted to represent it in collective bargaining negotiations. He suggested, however, that since the union was making a change in its team composition, Procter & Gamble also could change the procedural ground rules. Larsen reminded Robinson of the plant's security rule.
 
 
 10
 Robinson then urged the Port Ivory union to use only local employees on its committee and to bargain as it had in the past. The union refused to comply or to name the outsiders who would participate. Consequently in September 1976, Robinson told the union that if it insisted on including outsiders, negotiations could not be held on the plant premises because of the security rule[6] and that Procter & Gamble would not pay employee negotiators. The union responded that it had no choice but to hold the negotiations outside the plant and offered its union hall as an alternative site. Procter & Gamble refused to meet at the union hall, so negotiations were held at various local motels with the parties sharing the rental cost of the facilities.
 
 
 11
 At the first meeting on October 6, 1976, three outsiders were present: Omer Jones (Kansas City), Hoyt Middlebrooks (Dallas), and Raymond Bramble (Baltimore). Port Ivory union president, Ken McCauley, introduced the three as members of the union's bargaining committee and stated that they were present to negotiate a contract for only Port Ivory. Robinson then asked each outsider the series of prepared written questions received from Larsen about their role and purpose in participating in the bargaining. After his interrogation, Robinson adjourned the meeting to study the ramifications of having outsiders present. Thirteen additional sessions were held in which outsiders did not participate and an agreement was reached and signed on November 16, 1976.
 
 
 12
 At Kansas City, Dallas, and Baltimore, the same sequence of events unfolded: management refused to hold negotiations on the plant premises if outsiders participated because of the security rule and it discontinued paying local employee negotiators; the unions protested these changes but eventually agreed to meet at local motels, thereby incurring half the rental cost of these alternative facilities; and at each opening session, the Procter & Gamble representative asked the outsiders the questions furnished by the industrial relations staff even though the outsiders had been introduced as members of the negotiating union's bargaining committee.
 
 
 13
 Aside from the opening session for each plant and one afternoon session of the Dallas negotiations, outsiders did not otherwise participate in the bargaining.[7] Because negotiations were held during weekday working hours, outsiders had to obtain some form of leave in order to attend any sessions and as the negotiations progressed, this became increasingly difficult.
 
 
 14
 The outsiders' efforts to obtain leave commenced when the Port Ivory negotiations opened in early October 1976. In order to participate, outsiders from Kansas City, Dallas, and Baltimore requested union business leave as provided in their effective collective bargaining agreements. The wording in each contract was nearly identical: "By agreement between the Plant Manager and the Union, leaves of absence without pay up to thirty (30) days per year may be granted for the purpose of attending to Union business." (Jt.App. at 378-79 (Baltimore). See Jt.App. at 174 (Port Ivory); 375 (Dallas); 991 (Kansas City).) Although the preamble to each contract defined "union" as the contracting labor organization for that agreement, union officials in Kansas City and Baltimore anticipated using union business leave to participate as outsiders because in the past they had obtained such leave to attend Amalgamation and Council meetings and to visit government officials as well as to attend to their local union's affairs. Officials of the Dallas union were not so optimistic. In 1975, one official had requested union business leave in order to go to Procter & Gamble's plant in Alexandria, Louisiana to explain the Dallas contract to the Alexandria union membership. Dallas management denied the request because the leave did not relate to the Dallas union's business. The denial was grieved and resulted in arbitration upholding management's position. Procter & Gamble Manufacturing Co. v. Independent Oil & Chemical Workers of Dallas, (Jan. 5, 1978) (Yarowsky, Arb.) (Jt.App. at 808).
 
 
 15
 Managers at Kansas City, Dallas, and Baltimore denied the requests for union business leave to attend the Port Ivory negotiations because they now uniformly interpreted the union leave provisions to cover only local union affairs, which did not include representing the Port Ivory union. The Dallas industrial relations manager further warned his employees that they would be disciplined if they used union leave to negotiate at Port Ivory. When Port Ivory union officials later requested union leave to participate in the Kansas City negotiations, their personnel manager said that if they went to Kansas City, there would be "serious repercussions" and if they actually used union leave for that purpose, they would be disciplined. The Baltimore plant manager also told his employees that no leave would be granted to attend the Kansas City or Dallas bargaining sessions. Outsiders consequently gave up requesting union business leave.
 
 
 16
 Outsiders next requested vacation leave for days on which negotiations were scheduled. On October 13, 1976, the Baltimore union president, Walter Donnellon, requested a one-day vacation for October 15 when a Port Ivory bargaining session was to be held. His request was denied because a purported departmental policy, with which Donnellon was unfamiliar, required ten-days advance notice for vacation leave.[8] Substitute workers apparently were available. Donnellon also asked two other Baltimore employees to request vacation leaves for October 15; their requests were granted. Donnellon grieved the leave denial, the supposed policy was abandoned, and Donnellon subsequently received vacations on one day's notice.
 
 
 17
 Omer Jones (Kansas City) and Roger Hatton (Dallas) also requested vacation leave in order to participate in the bargaining at Port Ivory. Jones' request was denied because another employee already was scheduled for vacation at that time. Hatton's request was denied because no substitute was available.
 
 
 18
 Despite difficulties in obtaining vacation leave, Omer Jones requested leave, on March 24, 1977, for the following day when negotiations were scheduled for Dallas. Although Jones' supervisor had told him a week earlier that one day's notice was sufficient, Jones' vacation request was denied because of the short notice. Substitute workers were available.
 
 
 19
 Because the outsiders could not obtain any form of leave, the union engaged in negotiations asked its management to meet evenings or weekends when outsiders could attend without leave. Except for the opening session at Kansas City which was held on a Sunday, Procter & Gamble refused to meet at these times.
 
 
 20
 Based on these facts, the Board found that Procter & Gamble made a concerted effort to discourage participation by outsiders. First, if the unions had not attempted to include outsiders, management at all four plants would have continued the past practices of negotiating on the plant premises and of paying local employee negotiators. Although an employer has no statutory duty to do either, the Board found that discontinuing these practices was simply retaliation over the unions' selection of outsiders as their bargaining representatives. The assertion that the plants' security rules necessitated meeting off the premises was a mere pretext to impede the unions, particularly since union attorneys had attended previous bargaining sessions held at the plant. Thus, the Board concluded that Procter & Gamble violated subsections 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1), (5), and ordered it to cease and desist from refusing to make its plant premises available or to pay local employee negotiators because the union invited persons outside the bargaining unit to participate in contract negotiations. The Board also affirmatively ordered Procter & Gamble to reimburse each union for sums expended to rent alternative meeting facilities in 1976-77 and to pay the local employees for the work time they lost negotiating in 1976-77.
 
 
 21
 The Board next found that Procter & Gamble's interpretation of the union business leave provisions as limited to local union business was reasonable. Accordingly it dismissed allegations that such leave denials were unlawful and that the Dallas and Port Ivory managements had unlawfully threatened to discipline employees if they misused union leave to participate in another union's negotiations.
 
 
 22
 The Board, however, found that Procter & Gamble's denial of vacation time or some alternative form of uncompensated leave to its employees so they could attend negotiations elsewhere while management simultaneously refused to bargain evenings or weekends effectively precluded outsider participation. Recognizing that the geographic distances between the plants made evening or weekend sessions impracticable, the Board concluded that simply the leave denials prevented the unions from selecting their bargaining representatives and violated subsections 8(a)(1) and (5) of the Act. In drawing this conclusion the Board relied heavily upon the Seventh Circuit's decision in NLRB v. Indiana & Michigan Electric Co., 599 F.2d 185 (7th Cir. 1979), cert. denied, 444 U.S. 1014, 100 S.Ct. 663, 62 L.Ed.2d 643 (1980). The Board ordered Procter & Gamble to cease and desist from denying uncompensated leave and/or vacation time.
 
 
 23
 On appeal, Procter & Gamble contends that the Board erred in finding it made an orchestrated effort to dissuade the unions from including outsiders on their bargaining committees, because it actually met with the unions' full committees and negotiated contracts. This is all that subsection 8(d) of the Act requires.[9] Procter & Gamble also raises objections to the Board's specific findings on the issues of meeting on the plant premises, paying the local employee negotiators, and denying leaves.
 
 
 24
 At the outset, we note that section 7 of the Act, 29 U.S.C. § 157, guarantees employees the right "to bargain collectively through representatives of their own choosing ...."[10] While the Supreme Court has recognized this right as fundamental to the statutory scheme, NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S.Ct. 615, 622, 81 L.Ed. 893 (1937), it is not absolute: the employer may refuse to negotiate with the union bargaining committee if he can carry the heavy burden of showing that the selected representatives present a clear and present danger to the collective bargaining process. IBEW v. NLRB, 557 F.2d 995, 998 (2d Cir. 1977); NLRB v. David Butterick Co., 399 F.2d 505, 507 (1st Cir. 1968); Harley Davidson Motor Co., 214 N.L.R.B. 433 (1974). This rule requires the employer to show exceptional circumstances such as bad faith or ulterior motive underlying the union's choice of its bargaining team members. Mere inclusion of persons outside the negotiating unit does not constitute exceptional circumstances. Indiana & Michigan Electric, 599 F.2d 185 (other units); Minnesota Mining & Manufacturing Co. v. NLRB, 415 F.2d 174, 177-78 (8th Cir. 1969) (other locals); General Electric Co. v. NLRB, 412 F.2d 512, 517-20 (2d Cir. 1969) (other international unions); Standard Oil Co. v. NLRB, 322 F.2d 40, 44 (6th Cir. 1963) (other locals). Further, the employer's claim that the union's use of outsiders is an unlawful attempt to compel companywide or multiplant bargaining also is insufficient unless the employer can demonstrate that the union actually attempted to bargain outside unit boundaries. Indiana & Michigan Electric, 599 F.2d at 191; Minnesota Mining, 415 F.2d at 178; General Electric, 412 F.2d at 519-20.
 
 
 25
 In this case, Procter & Gamble did not refuse to bargain collectively with the unions' committees and the unions did not engage in multiplant bargaining without Procter & Gamble's consent. Each round of bargaining and the resulting agreement were confined to a single plant. Thus, the Board properly found that the unions' "coordinated bargaining"[11] presented no clear and present danger to the collective bargaining process. This case, however, does raise the issue of whether Procter & Gamble violates the Act by engaging in conduct which effectively chills its employees' right to select their own bargaining representatives by preventing or discouraging those representatives from fully participating in the negotiations. The Board concluded, and we affirm, that Procter & Gamble's conduct at all four plants constitutes such a violation.
 
 
 26
 First, Procter & Gamble seeks to justify its unilateral changes in bargaining procedure discontinuing negotiations on the plant premises and pay for local employee negotiators on several grounds: the plant security rules are valid, longstanding, and not applied discriminatorily; there is no statutory obligation to meet at the plant; alternative sites were available; meeting elsewhere was an accommodation to the unions; and the unions mutually agreed to the changes. The Board found, however, that Procter & Gamble used its security policy as a mere pretext and really instituted these changes as retaliation over the unions' inclusion of outsiders. We must accept the Board's findings as conclusive because they are "supported by substantial evidence on the record considered as a whole ...." Subsections 10(e) and (f) of the Act, 29 U.S.C. § 160(e), (f); Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 463-64, 95 L.Ed. 456 (1951); Barrus Construction Co. v. NLRB, 483 F.2d 191, 197 (4th Cir. 1973); NLRB v. Aerovox Corp. of Myrtle Beach, 435 F.2d 1208, 1209 (4th Cir. 1970). In prior years, union attorneys had attended negotiations in the plant without objection; it would be no more difficult to police three outside employees. Further, the unions clearly did not agree to the changes. They protested before negotiations began and they subsequently filed unfair labor practice charges alleging that Procter & Gamble's unilateral changes were unlawful. While an employer has no statutory obligation either to pay employee negotiators for lost work time or to negotiate on the plant premises subsection 8(d) of the Act only mandates meeting at reasonable times and in good faith and while an employer may have the right to exclude nonemployees from its plant for legitimate business reasons, NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112-14, 76 S.Ct. 679, 684-85, 100 L.Ed. 975 (1956), an employer cannot discontinue such longstanding practices where the effect is to interfere with, restrain, or coerce employees in the exercise of their § 7 rights. Borg-Warner Controls, 198 N.L.R.B. 726, 728, 730 (1972). Accordingly, we uphold the Board's findings and conclusions.
 
 
 27
 Second, Procter & Gamble raises numerous objections to the Board's order that it cease and desist from denying uncompensated leave and/or vacation time to outsiders. Procter & Gamble contends that an alternative form of uncompensated leave had never been requested, was never denied, and is not provided for in the contracts. The Board's order, therefore, imposes a new contractual term upon the parties without their bargaining over it and, in effect, requires Procter & Gamble to insure that its employees from one plant are available for negotiations at another. Further, because the Board placed no limitations upon this uncompensated leave, the Company's business operations may be disrupted seriously. Finally, Procter & Gamble contends that the Board's reliance on Indiana & Michigan Electric, 599 F.2d 185, is misplaced because the two situations are factually distinct and the Board's ruling in this case goes far beyond the Seventh Circuit's decision.
 
 
 28
 We affirm the Board's findings because they are supported by substantial evidence and we hold this remedy is within the Board's authority and discretion. Uncompensated leave was never requested or denied in 1976-77 because the union officials anticipated using either union leave to attend the negotiations as they had used it in the past to attend Amalgamation and Council meetings or vacation time. They soon found it futile, however, to seek any form of leave as their requests were denied because of purported departmental policies on advance notice or because the notice given was too short. While uncompensated leave to attend negotiations elsewhere was not explicitly provided for in the contracts, at least the Port Ivory and Dallas contracts in effect during the 1976-77 negotiations contained a personal leave provision:
 
 
 29
 Upon application to his department manager or supervisor, with good and sufficient reasons, an employee shall, when plant conditions permit, be granted a leave of absence without pay for a reasonable length of time. Such request shall be made as far in advance as possible.
 
 
 30
 (Jt.App. at 174 (Port Ivory 1973 Agreement). See also Jt.App. at 375 (Dallas 1974 Agreement).)[12] Surely serving as a bargaining representative for another union, when substitute workers are available, is a good and sufficient reason for uncompensated leave and easily could be covered by the personal leave provisions. Procter & Gamble also should not be heard to complain about the Board's decision not to define the form of such uncompensated leave. The above personal leave provision apparently only limits the number of employees requesting uncompensated leave to the number at which plant operations will not be disrupted; it limits the duration of such leave to a "reasonable length of time"; and it states nothing about the frequency of such leave requests. These are the very factors which Procter & Gamble contends are problems with the Board's alternative remedy of uncompensated leave in this case. Obviously they cannot be so problematic. Further, Procter & Gamble has the first shot at placing limits on uncompensated leave as long as its limits do not interfere with employees' statutory rights, and particularly with their choice of bargaining representatives. Procter & Gamble also has some leeway to grant employees vacation time or to meet evenings or weekends rather than to grant any uncompensated leave, although utilizing these options necessarily is limited because of the geographic distances involved. There is no indication that the uncompensated leave remedy will be abused in a manner disrupting Procter & Gamble's business operations. That Procter & Gamble may limit such leave for valid business reasons or choose other alternatives demonstrates the contrary. Procter & Gamble's options also demonstrate that the Board's order does not impose a new contractual provision upon the parties. The cease and desist order serves only to remedy the unfair labor practices found in this case, and as such, we hold that it is a proper exercise of the Board's wide discretion in fashioning remedies. NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547 (1969); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964).
 
 
 31
 Finally, the Board's reliance on Indiana & Michigan Electric, 599 F.2d 185, is not misplaced. That case involved four plants within a small geographic area and four bargaining units of a local union, each plant and unit having their own contract. During the 1975-76 contract renewal cycle, the union, which eventually wants companywide bargaining, was represented by permanent union officials, employee members of the unit whose contract was being renegotiated, and "travelers" employee members of the other three units. The Company had prior experience with travelers participating in initial sessions of the 1973 and 1974 negotiations. In 1975-76, however, travelers sought leave to attend all scheduled meetings. The Company denied such requests because it thought the union was forcing multiplant bargaining and such extensive leaves would be burdensome to administer. The Company also refused to meet evenings or weekends. The Board found that the union did not engage in multiplant bargaining, but that the Company did violate subsections 8(a)(1) and (5) of the Act "by refusing to grant travelers uncompensated leave to permit them to engage in bargaining during working hours, while simultaneously refusing the Union's request to bargain during nonworking hours since its conduct interfered with the Union's right to select its own bargaining representatives." Id. at 189.
 
 
 32
 In our case, the Board found Indiana & Michigan Electric to be persuasive despite somewhat different factual settings. First, Indiana & Michigan Electric involved four separate bargaining units of one union; this case involves four independent unions. As discussed above, however, a union may select anyone to serve as its bargaining representative. Second, in Indiana & Michigan Electric the plants were within 133 miles of each other; in this case the plants are scattered across half the United States. Further, both companies denied leave requests and simultaneously refused to meet evenings or weekends. In Indiana & Michigan Electric, the Board gave the Company the option of granting uncompensated leave or meeting during nonworking hours. In this case, the logistical difficulties of meeting evenings or weekends when the plants are so widely scattered demonstrates, if anything, that it would be irrational for the Board not to order uncompensated leave as a cease and desist remedy.[13] Accordingly, we find that Indiana & Michigan Electric is persuasive authority for the Board's conclusions and order in this case.
 
 
 33
 Finding no error in the Board's findings and conclusions with respect to the subsection 8(a)(1) and (5) violations, we grant enforcement on this portion of the Board's order.
 
 II
 
 34
 The Board concluded that Procter & Gamble violated subsections 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3), by denying vacation leave to Walter Donnellon (Baltimore union president) and to Omer Jones (Kansas City union president) in order to prevent them from participating in negotiations at Port Ivory and Dallas, respectively. The Board's findings are supported by substantial evidence. Donnellon's vacation leave request for October 15 was denied because of a purported departmental policy requiring ten-days advance notice. Donnellon was unfamiliar with this new policy and it was not applied to other Baltimore employees requesting leave for the same day. The Baltimore plant manager also clearly knew when the Port Ivory negotiations were scheduled because he told Donnellon that the October 15 session was cancelled a day before the Port Ivory union learned of the cancellation. Omer Jones' vacation leave request for March 25, 1977 was denied because of too short notice one day. Jones' supervisor, however, had told him a week earlier that one day's notice was sufficient, and Jones' absence would not have disrupted the work schedule. Accordingly, we affirm the Board's conclusions that these denials violated subsections 8(a)(1) and (3) of the Act.
 
 
 35
 The Board also found that Procter & Gamble violated subsections 8(a)(1) and (3) when it twice suspended Omer Jones for attending negotiations on March 25 and July 18, 1977, without leave. Jones was president of the Kansas City union in 1977 and had worked at the plant for 44 years. He had a good attendance record and had never been disciplined. When Jones' request for vacation time on March 25 was denied, he nevertheless absented himself from work and participated in the Dallas bargaining session held that day. When Jones returned to work, his supervisor knew that he had been in Dallas. Jones was suspended for one day. Because it was futile to request a leave, Jones also absented himself from work on July 18, 1977, in order to attend a bargaining session at Baltimore. This time Jones' wife called the Kansas City plant on July 17 and reported that he would not be at work the following day. In the past, Jones had taken time off after simply calling in beforehand. Jones also was absent from work on July 19 because his mother-in-law had an emergency operation. His absence on July 19 was excused, but Jones received a five-day disciplinary suspension because of his absence on July 18. Jones' supervisor testified that he was suspended because his excuse for July 18 was not "a good reason." (Jt.App. at 1772-73.) The Board found that Procter & Gamble disciplined Jones because he participated in the Dallas and Baltimore negotiations and because it sought to discourage the outsiders. The Board ordered Procter & Gamble to cease and desist from disciplining employees engaged in protected activities, to make Omer Jones whole for any loss of pay suffered because of his suspensions, and to expunge his personnel file.
 
 
 36
 Procter & Gamble contends that Jones' suspensions were justified because he twice absented himself from work without leave acts of deliberate insubordination. Further, Jones' union activities do not immunize him from discipline. Procter & Gamble correctly asserts that mere union membership or concerted activity does not insulate an employee from being disciplined for just cause. Florida Steel Corp. v. NLRB, 601 F.2d 125, 131-32 (4th Cir. 1979); Firestone Tire & Rubber Co. v. NLRB, 583 F.2d 1268, 1273 (4th Cir. 1978). Rather, as this court has stated on numerous occasions, when the employer has come forward with evidence of a legitimate and substantial business justification for disciplining an employee, the burden is on the Board not simply to declare the disciplinary action is pretextual because there is some evidence of improper motive, but to find "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one." Firestone Tire & Rubber Co. v. NLRB, 539 F.2d 1335, 1337 (4th Cir. 1976) (quoting NLRB v. Billen Shoe Co., 397 F.2d 801, 803 (1st Cir. 1968)). See also Florida Steel, 601 F.2d at 131-32; Firestone, 583 F.2d at 1273; NLRB v. Patrick Plaza Dodge, Inc., 522 F.2d 804, 807 (4th Cir. 1975); NLRB v. Consolidated Diesel Electric Co., 469 F.2d 1016, 1024 (4th Cir. 1972). In carrying this burden, the Board must produce substantial evidence of antiunion motivation. Florida Steel, 601 F.2d at 132; Firestone, 583 F.2d at 1273; Patrick Plaza Dodge, 522 F.2d at 807; Maphis Chapman Corp. v. NLRB, 368 F.2d 298, 304-05 (4th Cir. 1966).
 
 
 37
 Applying these standards, we conclude that the Board properly found Procter & Gamble unlawfully suspended Jones in March and July 1977. Although Procter & Gamble introduced evidence of a just cause for its disciplinary actions Jones' unapproved absences from work the Board found antiunion motivation in Procter & Gamble's denying Jones leave in order to prevent him from participating in negotiations elsewhere; in suspending him without the usual "advisory talk" or warning despite his good record; in disciplining Jones when he was absent in order to attend a Baltimore bargaining session but not when he was absent because his mother-in-law was undergoing an operation; and in Procter & Gamble's overall hostility to the unions' attempt at coordinated bargaining. The question whether Jones was suspended because of Procter & Gamble's antiunion bias or because of his unexcused absences from work is a question of fact to be decided by the National Labor Relations Board, which is empowered by Congress to weigh the employer's interest "in operating his business in a particular manner" against the employees' interest in concerted activities. NLRB v. Erie Resistor Corp., 373 U.S. 221, 227-29, 236, 83 S.Ct. 1139, 1144-46, 1149, 10 L.Ed.2d 308 (1963); NLRB v. Lester Brothers, Inc., 337 F.2d 706, 708 (4th Cir. 1964). In this case, there is substantial evidence on the record as a whole to support the Board's finding that Procter & Gamble suspended Jones because of his union activities. Accordingly, we grant enforcement to these portions of the Board's order.
 
 III
 
 38
 The Board found that at its Kansas City and Dallas plants, Procter & Gamble refused to sign single instruments embodying the agreed-upon contracts where such documents would contain the signatures of the respective union's entire bargaining committee in order not to recognize outsiders as members of those committees. The Board concluded these refusals violated subsections 8(a)(1) and (5) of the Act, 28 U.S.C. § 158(a)(1), (5), and it ordered Procter & Gamble to cease and desist from such refusals to sign and ordered the Kansas City management to sign the 1977 contract upon the union's request.
 
 
 39
 In Kansas City, the union officials and management could not agree upon a formal meeting to sign the contract immediately after the union membership ratified it on February 4, 1977. The plant manager, Robert McIntire, then refused to meet with the entire union bargaining committee. Instead, he gave the union president, Omer Jones, two copies of the contract with space for only their two signatures and stated that only Jones' signature was necessary to bind the union. Jones refused to sign and insisted that the union's entire committee was to execute the agreement. In the past, the parties had signed a single document with the bargaining committee, but not necessarily every member thereof, signing on behalf of the union. On February 9, Jones presented a contract to McIntire signed by the entire union team, including the outsiders, but McIntire refused to sign it. Rather, he signed yet another copy of the agreement and completely crossed out the union's signature line. McIntire enclosed this contract with a letter to Jones, stating that Procter & Gamble considered only Jones' signature to be necessary and, therefore, it was disregarding the other union signatures on Jones' February 9 copy. Further, it considered the two separately signed instruments together to complete the signing process and to produce a binding agreement. McIntire justified crossing out the union's signature line on the enclosed copy because he already had Jones' signature on the February 9 copy. (Jt.App. at 447.)[14] To date, the parties have never signed a single instrument although they agree that there is a valid contract in existence.
 
 
 40
 In Dallas, the union membership ratified the agreed-upon contract on April 7. The local management proposed that only union president, Roger Hatton, and plant manager, Niles Millsap, sign the contract. Hatton suggested, however, that the parties continue the past practice of signing one instrument with the plant manager signing for Procter & Gamble and the union's negotiating committee signing for the union. Management then proposed either that the Dallas employees (but not the outsiders) and Millsap sign one contract or that two separately executed agreements be combined as in Kansas City. The union continued to insist upon a single executed instrument and a formal signing meeting. Millsap then sent Hatton a contract which he had signed with the space for all other signatures, including Hatton's, crossed out.[15] The cover letter stated that Procter & Gamble had satisfied its obligation to sign and only Hatton's signature was necessary on behalf of the union. Other signatures would be unacceptable. (Jt.App. at 661.) The parties again discussed signing the contract at the monthly meeting on May 5, 1977, but reached no agreement. On April 25, 1978, during the course of the unfair labor practices hearing, the new plant manager, Roy Gillespie, and sixteen of the eighteen union negotiators,[16] including the three outsiders, signed the contract. There was no formal meeting to execute the agreement; the union signed first and then presented the contract to Gillespie.
 
 
 41
 Subsection 8(d) of the Act, 29 U.S.C. § 158(d), requires "the execution of a written contract incorporating any agreement reached if requested by either party ...." The Supreme Court has noted that "refusal to sign a written contract has been a not infrequent means of frustrating the bargaining process through the refusal to recognize the labor organization as a party to it ...." H. J. Heinz Co. v. NLRB, 311 U.S. 514, 523-24, 61 S.Ct. 320, 324-25, 85 L.Ed. 309 (1941). Thus, the Board is authorized under subsection 10(c) of the Act, 29 U.S.C. § 160(c), to order the employer, at the union's request, to sign the agreed-upon contract. Id. at 526, 61 S.Ct. at 325; NLRB v. Coletti Color Prints, Inc., 387 F.2d 298, 304 (2d Cir. 1967); NLRB v. Huttig Sash and Door Co., 362 F.2d 217, 219 (4th Cir. 1966).
 
 
 42
 In this case, Procter & Gamble's refusals to sign the 1977 Kansas City and Dallas agreements in sharp contrast to past practice result solely from its opposition to the inclusion of outsiders on the unions' bargaining teams. At each plant, the plant manager insisted that only the union president's signature was necessary on behalf of the union and he crossed out the remaining space on the contracts in order to preclude additional signatures. Procter & Gamble contends that the unions, and not management, refused to sign the agreed-upon contracts, but the Board discredited that version. Since it is in a unique position to judge witnesses' credibility and because there is substantial evidence to support its determination that Procter & Gamble refused to sign the contracts, we will not upset these findings and conclusions on review. Aerovox Corp., 435 F.2d at 1210; NLRB v. M&B Headwear Co., 349 F.2d 170, 173 (4th Cir. 1965).
 
 
 43
 Procter & Gamble also argues that because both agreements have been signed, the issue is moot. In addressing this argument, we must distinguish between the cease and desist portion of the Board's order requiring Procter & Gamble not to refuse to sign an agreement because outsiders also will sign it and the affirmative portion of the Board's order requiring Procter & Gamble to sign the 1977 Kansas City contract upon that union's request. The cease and desist portion is entitled to enforcement as a continuing obligation in order to prevent resumption or repetition of the unlawful conduct. NLRB v. Mexia Textile Mills, Inc., 339 U.S. 563, 567, 70 S.Ct. 826, 828, 94 L.Ed. 1067 (1950); NLRB v. Metalab-Labcraft, 367 F.2d 471, 472 (4th Cir. 1966). Because the 1977 Kansas City agreement by its own terms expired on February 3, 1980, however, we decline in this case to examine the validity of the Board's affirmative order to sign the contract. NLRB v. Cosmopolitan Studios, Inc., 291 F.2d 110, 112 (2d Cir. 1961). Therefore, we grant enforcement only to the cease and desist portion of the order.
 
 IV
 
 44
 The Board found one other unfair labor practice. It concluded that Procter & Gamble, at its Port Ivory plant, violated subsection 8(a)(1) of the Act, 28 U.S.C. § 158(a)(1), when its soap and synthetic plant manager, Armin Sharfe, threatened employees that participation by outsiders in the negotiations would result in a less favorable contract than one negotiated by only local employees. The Board ordered Procter & Gamble to cease and desist from such threats.
 
 
 45
 The Port Ivory union vice president, Gordon Canney, testified that he spoke informally with Sharfe on several occasions during May through August 1976. Sharfe inquired about the union's plan to include outsiders on its bargaining committee and stated that Procter & Gamble would fight multiplant bargaining in every way. Canney also testified that he and Gordon Ritchie, a union executive committeeman, spoke with Sharfe in the plant cafeteria on or around September 8, 1976. Sharfe again expressed disapproval of multiplant bargaining, asked who the outsiders would be, and stated that the union would " 'not get a good contract by bringing people in from another plant because we (Procter & Gamble) are not going to show the rest of the plants that it's beneficial to belong to the Amalgamation.' " (Jt.App. at 1171.) Canney further testified that Sharfe said a contract with outsiders would be approximately five cents less per hour per employee.
 
 
 46
 Gordon Ritchie's testimony corroborated Canney's description of the September 8 discussion with Sharfe. Although Ritchie was not present for the entire meeting, he reported that Sharfe said outsiders "could cost us (the union) in money with the contract" (Jt.App. at 1196), and when Canney had then asked Sharfe to explain that statement, Sharfe replied, "well, it would cost you at least five cents a person per hour for the upcoming contract." (Jt.App. at 1197.)
 
 
 47
 Sharfe admitted voicing his opposition to both outsiders and multiplant bargaining to various union members, but he expressly denied making any alleged threats of a less favorable contract. Sharfe also denied meeting with Canney and Ritchie in September 1976. Rather, he testified that he discussed, with Ritchie only, the effect of outsiders on the upcoming negotiations, and in response to Ritchie's inquiry about the outsiders' financial impact, Sharfe speculated that the resulting contract might be five cents an hour less.
 
 
 48
 The Board first found that Sharfe did say a contract negotiated with outsiders would be worth about five cents an hour less for employees and that he also stated that the Port Ivory union would not get as good a contract because Procter & Gamble did not want to encourage employees at other plants to join the Amalgamation. The Board then looked to the context of Sharfe's remarks. Although he did not participate in the Port Ivory contract negotiations later held in October and November 1976, Sharfe was a Port Ivory plant manager, he had participated in the 1973 negotiations, and he was obviously well-informed about the 1976 bargaining atmosphere. High-ranking union officials, primarily responsible for the upcoming negotiations, would be likely to give special credence to Sharfe's comments. Therefore, the Board concluded that these comments were unlawful threats.
 
 
 49
 Procter & Gamble contends that Sharfe's comments are protected by subsection 8(c) of the Act[17] and the First Amendment. The Supreme Court has addressed the balance to be struck between an employer's free speech rights as protected by subsection 8(c) and employees' rights to associate freely as embodied in section 7, subsection 8(a)(1), and the proviso to subsection 8(c). In Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, the Court held that:(a)ny assessment of the precise scope of employer expression ... must be made in the context of its labor relations setting.... And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.
 
 
 50
 Id. at 617, 89 S.Ct. at 1942. See also NLRB v. McCormick Concrete Company of S.C., Inc., 371 F.2d 149, 152 (4th Cir. 1967). The Supreme Court also recognized "the Board's competence in the first instance to judge the impact of (employer) utterances ...." Gissel, 395 U.S. at 620, 89 S.Ct. at 1943; accord, McCormick Concrete, 371 F.2d at 152; E. I. Du Pont de Nemours and Co. v. NLRB, 480 F.2d 1245, 1247-48 (4th Cir. 1973). The question of whether an employer's comments are coercive is a factual one and the Board's findings shall be affirmed on review if supported by substantial evidence. Du Pont, 480 F.2d at 1247.
 
 
 51
 First, we uphold the Board's findings that Sharfe, in order to discourage multiplant bargaining, told the union officials that a contract negotiated with outsiders would be less favorable to Port Ivory employees than one negotiated with only local union members. There is substantial evidence to support these findings and because they go to the credibility of various witnesses, the findings are peculiarly within the province of the hearing officer and the Board and, therefore, entitled to acceptance on review. NLRB v. Dover Corp., Norris Division, 535 F.2d 1205, 1209 (10th Cir. 1976). Second, we hold that the Board properly analyzed both the effect of Sharfe's comments in toto and the probability that they would have a particularly chilling effect on the union officials in concluding they were unlawful threats. Considering the nature of Sharfe's remarks and the conditions under which they were made, the Board did not err in reaching its conclusions and we grant enforcement to its cease and desist order.[18]
 
 V
 
 52
 On appeal, Procter & Gamble argues that subsection 10(b) of the Act, 29 U.S.C. § 160(b), bars the Board from considering either Omer Jones' March 1977 suspension or the Dallas management's refusals to make the plant premises available for bargaining and to pay local employees for the work time they lost while in negotiations. Subsection 10(b) provides in pertinent part that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board ...." Thus, if this proviso to subsection 10(b) is applicable, the Board lacks jurisdiction to adjudicate an unfair labor practice alleged in the untimely charge.
 
 
 53
 Kansas City union president, Omer Jones, received a one-day disciplinary suspension for attending the Dallas negotiations without leave. No unfair labor practice charge specifically challenged this conduct. The Kansas City union, however, had filed three unfair labor practice charges with the Board prior to Jones' suspension. Two of these charges had alleged that Procter & Gamble, in violation of subsections 8(a)(1) and (5) of the Act, had denied employees vacation leave or time off in order to prevent them from participating in the negotiations at Port Ivory and at other plants and had imposed discriminatory conditions on the union in retribution for its exercise of the right to select its bargaining representatives. The consolidated amended complaint of December 29, 1977 contained the necessary allegation as a subsection 8(a)(3) violation also. The Board found the earlier charges were sufficiently broad to encompass Jones' March suspension and, therefore, it considered this allegation on its merits.
 
 
 54
 Subsection 10(b)'s proviso, by its language, extinguishes liability for unfair labor practices committed more than six months prior to the filing of the charge. "It does not relate to conduct subsequent to the filing of the charge." NLRB v. Fant Milling Co., 360 U.S. 301, 309 n.9, 79 S.Ct. 1179, 1184 n.9, 3 L.Ed.2d 1243 (1959). The Supreme Court has held that the Board may deal with subsequent conduct under a previous charge if the conduct is "related to" the unfair labor practices alleged in the charge and grows out of them while the proceeding is pending before the Board and if it is of the "same class" of violations as those alleged in the charge. Id. at 307, 79 S.Ct. at 1183. See also NLRB v. Jack La Lanne Management Corp., 539 F.2d 292, 293, 295 (2d Cir. 1976); NLRB v. Southern Materials Co., 447 F.2d 15, 18 (4th Cir. 1971); NLRB v. Dinion Coil Co., 201 F.2d 484, 491 (2d Cir. 1952). Further, a charge does not serve the purpose of a pleading; its purpose is solely to set the Board's investigative machinery in motion. Fant Milling, 360 U.S. at 307, 79 S.Ct. at 1183. Thus, the Board has broad leeway to found a complaint on events not specified in the charge as long as it does not initiate the proceeding on its own, NLRB v. I.U.O.E., Local 925, 460 F.2d 589, 596 (5th Cir. 1972) (quoting Texas Industries, Inc. v. NLRB, 336 F.2d 128, 132 (5th Cir. 1964)), and unlike a charge, a complaint need not be filed and served within the six month period. Dinion Coil, 201 F.2d at 491.
 
 
 55
 After examining the record, we conclude that the Board properly found the earlier charges covered Jones' March 1977 suspension. The Board found Jones was denied vacation leave for March 25 in order to prevent him from attending the Dallas negotiations and he was disciplined because he attended those negotiations after absenting himself from work without leave. Such conduct clearly is related to the denial of vacation leave or time off to attend bargaining sessions at other plants. The practices complained of occurred within the same general time period and were part of the entire series of interrelated efforts by Procter & Gamble to discourage the unions' inclusion of outsiders on their bargaining teams. Finally earlier charges adequately informed Procter & Gamble that its leave denials had been challenged.[19]
 
 
 56
 Procter & Gamble also contends that subsection 10(b) bars consideration of the allegations of paragraph 15 of the Dallas consolidated amended complaint that Procter & Gamble refused to make the plant premises available for bargaining or to pay local employees for the work time they spent in negotiations from March 11 to April 6, 1977. The Dallas union filed four unfair labor practice charges with the Board, which did not specifically challenge these refusals, but did contain printed language that "(b)y the above and other acts, the above-named employer has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act." (Jt.App. at 24-25, 29.)[20] The Board concluded that under the circumstances of this case, the catchall language of the charges legally encompassed the paragraph 15 allegations. In reaching this conclusion, it looked at the broad picture, focusing on an orchestrated effort by the four unions to include outsiders and a pattern whereby the management at each plant engaged in a substantially similar course of conduct in expressing its opposition to their inclusion.
 
 
 57
 Under Fant Milling and the other cases discussed above, the Board properly may issue complaints alleging other unfair labor practices not specified in the charge if "related to" or of the "same class" as the specified violations. At least one court has applied these principles in a similar case. In NLRB v. Braswell Motor Freight Lines, Inc., 486 F.2d 743 (7th Cir. 1973), the charge alleged unfair labor practices at respondent's Chicago terminal. The amended complaint, however, also alleged violations at its Atlanta and Jackson terminals. The court found a sufficient nexus between the conduct at Chicago and the other terminals to avoid subsection 10(b)'s application, particularly because "the company's conduct at the three locations was part of an overall plan to resist organization by the (union)." Id. at 746. In this case, the Board found that Procter & Gamble engaged in a concerted course of conduct at all four plants in order to prevent the unions from including outsiders. The refusals to bargain at the plant or to pay employee negotiators were both part and parcel of the Dallas management's and Procter & Gamble's overall opposition. Moreover, the other unions had filed charges claiming that similar unlawful refusals at their plants were part of this coordinated opposition. Thus, the paragraph 15 allegations clearly are grounded in the viable charges, Procter & Gamble had ample notice of these charges against it, and, therefore, the Board properly considered the merits of these claims.
 
 VI
 
 58
 The unions filed eleven viable unfair labor practice charges against Procter & Gamble which were transferred to the Board's regional office in Brooklyn, where complaints issued and the cases were consolidated pursuant to 29 C.F.R. § 102.33.[21] Procter & Gamble contends that the Board erred in never issuing one consolidated complaint covering all four plants and unions.
 
 
 59
 Consolidation is within the sound discretion of the Board, Fruin-Colnon Corp. v. NLRB, 571 F.2d 1017, 1020 n.3 (8th Cir. 1978); NLRB v. UMW District 31, 198 F.2d 389, 390 (4th Cir. 1952), and will not be disturbed where the parties are given a fair hearing, Barrus Construction, 483 F.2d at 195, and where no showing of prejudice is made. UMW, District 31, 198 F.2d at 390. In addition, any injury potentially caused by failure to issue a consolidated complaint is obviated when the employer has notice of the charges against him. An unfair labor practice complaint serves two purposes: "to present a clear and concise statement of the facts upon which jurisdiction by the Board is predicated and to indicate clearly and concisely the acts which are claimed to constitute unfair labor practices." NLRB v. Sunnyland Packing Co., 557 F.2d 1157, 1161 (5th Cir. 1977). See 29 C.F.R. § 102.15 (1980). The complaint is not to be judged by rigid pleading rules; it is sufficient if the employer has notice of the basis of the charges against him, Sunnyland, 557 F.2d at 1161, and absent a special showing of detriment, the lack of specifics in the complaint is tolerated. Owens-Corning Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1361 (4th Cir. 1969).
 
 
 60
 Procter & Gamble has not shown that it was prejudiced by consolidation or that it lacked notice of the charges against it. It did not move for separation of the cases and apparently contested transfer to Region 29 only in the case of the Dallas charges. Further, in its voluminous exceptions to the ALJ's decision and order, Procter & Gamble objects frequently to consolidation, but makes only a conclusory allegation of prejudice: because the ALJ issued one decision, he has attributed alleged unfair labor practices at one or two plants to all four plants. The record does not support this allegation. Although the ALJ issued one decision, he made separate findings of fact and conclusions of law for each plant and did not illogically mix the occurrences at the plants. See NLRB v. Tex-O-Kan Flour Mills Co., 122 F.2d 433, 437 (5th Cir. 1941) (consolidation of charges made by separate unions at two separate mills was proper). Further General Counsel has prosecuted these cases on the theory of a concerted effort by Procter & Gamble to discourage the inclusion of outsiders on the union bargaining committees. By transferring the charges to Region 29, issuing consolidated complaints for three plants, and consolidating all the cases for hearing, General Counsel gave Procter & Gamble indisputable notice of its theory of prosecution; Procter & Gamble has demonstrated no prejudice.
 
 
 61
 Finally, 29 C.F.R. § 102.33 does not require either a consolidated complaint or amendment of a complaint to reflect the issues as finally developed. While the regional director and the ALJ or Board, on motion, can amend a complaint "upon such terms as may be deemed just ...," 29 C.F.R. § 102.17 (1980), even failure to amend does not preclude finding an unfair labor practice where an issue is fully and fairly litigated. Free-Flow Packaging Corp. v. NLRB, 566 F.2d 1124, 1131 (9th Cir. 1978). Procter & Gamble certainly does not contend that it was unable to litigate any issue in these cases. Therefore, we find the Board did not abuse its discretion by failing to issue one consolidated complaint.
 
 VII
 
 62
 Finally, Procter & Gamble raises several objections to the issuance of the order and notice to be posted at the four plants.[22] First, Procter & Gamble argues that a single, common notice and order requires all four plants to remedy unfair labor practices found at only one plant. For example, all four plants are now ordered to make Omer Jones, a Kansas City employee, whole for any loss of pay resulting from his suspensions. Obviously upon enforcement of the Board's order, the affirmative relief which Procter & Gamble must undertake will be carried out in individual plants. The Kansas City plant naturally will be the one to pay Omer Jones. Procter & Gamble's real complaint is that the Board has used specific acts occurring at one plant to bolster its findings of an unlawful four-plant scheme to defeat or discourage coordinated bargaining. This argument replicates Procter & Gamble's objections to nonconsolidation of the complaints and for the same reasons discussed above, we find that it is meritless. Several courts, recognizing the Board's broad remedial powers, have upheld orders to post notices companywide even though the unlawful conduct was found to have occurred at only some company plants. See, e. g., J. P. Stevens & Co. v. NLRB, 612 F.2d 881, 882 (4th Cir. 1980); United Aircraft Corp. v. NLRB, 440 F.2d 85, 100 (2d Cir. 1971). The Board does not even go so far in this case since it limits the posting to the four plants involved. Accordingly, we find no error in the Board's order to post a common notice at all four plants.
 
 
 63
 Procter & Gamble also argues that the Board's order forces it to capitulate on three bargaining issues making the plant premises available for negotiations, paying local employee negotiators, and granting employees uncompensated leave to participate in negotiations at another company plant and such forced capitulation is beyond the Board's remedial power. H. K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); NLRB v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). First, we note that the cease and desist portion of the Board's order only requires Procter & Gamble to stop refusing to make the plant premises available, to pay local employee negotiators, and to grant uncompensated leave and/or vacation time when it engages in such conduct because the unions' bargaining teams include outsiders. Even assuming this prohibition involves mandatory subjects of bargaining about which the Board may not order agreement, H. K. Porter, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 an issue which we need not decide, the prohibition simply does not impose new contractual provisions on the parties. Procter & Gamble may refuse to bargain on its plant premises for other valid business reasons, it does not have to pay local employee negotiators indefinitely, and it is free to develop the form of leave to be granted. We conclude that the Board's cease and desist order, which seeks to ensure that Procter & Gamble cannot interfere again with the unions' choice of bargaining representatives, is a proper exercise of its discretion in fashioning remedies. Gissel, 395 U.S. at 612 n.32, 89 S.Ct. at 1939; Fibreboard Paper Products, 379 U.S. at 216, 85 S.Ct. at 405.
 
 
 64
 Procter & Gamble also objects to part of the affirmative relief in the Board's order. Specifically, it objects to the Board's two additions to the ALJ's recommended order that Procter & Gamble (1) reimburse the unions for sums expended as rent for alternative meeting facilities in 1976-77 and (2) pay local employees for the work time they lost while in the 1976-77 negotiations.[23] Both modifications require only that Procter & Gamble correct the injuries suffered by the unions and employees during the 1976-77 negotiations. Absent Procter & Gamble's refusals to make its plant premises available for the 1976-77 negotiations or to pay the employee negotiators, neither the unions nor employees would have suffered the economic losses at issue here. Consequently, we hold that the Board's modified order is well within its discretion to remedy unfair labor practices.
 
 
 65
 Accordingly, except for that portion of the order requiring Procter & Gamble to sign the 1977 Kansas City agreement, we enforce the Board's order in full.
 
 
 66
 ENFORCEMENT GRANTED.
 
 FIELD, Senior Circuit Judge, dissenting:
 
 67
 I would deny enforcement of the Board's order in this case. As the majority recognizes, four independent unions had for many years represented employees at four widely scattered plants of Procter and Gamble, and during those years certain negotiating procedures had been followed at each of these plants. In 1976 each of the four unions decided to include members of the other three unions on its bargaining committee which concededly was a step toward the unions' aim to bargain with Procter and Gamble on a multiplant basis. I had always been under the impression that when you start a new and different ballgame, as the unions did here, you do not continue to play under the rules of the old game. Yet that is exactly what the Board has ordered and the majority unfortunately has approved.
 
 
 68
 Procter and Gamble did not refuse to bargain with a committee containing "outsiders", but merely declined to continue its past practice of negotiating on plant premises and of paying local employee negotiators. The majority concedes that an employer has no duty to do either of these things, but finds that the discontinuance of such practices was retaliation for the unions' selection of "outsiders" on their committees. The company and the union negotiated with respect to the issue of the site of the bargaining sessions, and the parties agreed upon the site as well as the sharing of the costs of such facilities. Despite this fact the majority concludes that the company must not only make its premises available for future negotiations, but must reimburse the union for the rental cost which the union had agreed to pay incident to the 1976 bargaining sessions.
 
 
 69
 The Board's order forces Procter and Gamble to capitulate on three bargaining issues make the plant premises available for negotiations, pay local employee negotiators, and grant employees uncompensated leave to participate in negotiations at another company plant. I agree with counsel for the employer that such forced capitulation is beyond the Board's remedial power and flies in the face of H. K. Porter Co., Inc. v. National Labor Relations Board, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), by compelling Procter and Gamble to agree to a proposal of the union and requiring that it make concessions on bargainable issues. I am in accord with the observation of Judge Wood in National Labor Relations Board v. Indiana and Michigan Electric Company, 599 F.2d 185, 192 (1979) that "the union camel has been constantly circling the company tent probing for a way to stick its nose under, (and) (n)ow the Board itself has indirectly lifted the edge of the tent to make it easy". In my opinion the Board has no authority whatever to punish a company because it opposes a union, nor does it have the authority to force a company to facilitate the unions' efforts to attain their objectives.
 
 
 
 [1]
 The unions are: Independent Oil & Chemical Workers, Inc. (Port Ivory); Independent Oil & Chemical Workers of Kansas City, Kansas; Independent Oil & Chemical Workers of Dallas; and Independent Oil & Chemical Workers (Baltimore)
 
 
 [2]
 Multiplant bargaining is collective bargaining between an employer and the union(s) representing employees in more than one plant of that employer. It results in a single contract
 
 
 [3]
 "Outsiders" is the term used by the parties and the Board and adopted by this court to refer to employees at the other three Procter & Gamble plants whom the negotiating union invited to participate as its bargaining representatives
 
 
 [4]
 Nine independent unions, including the four in this case, also compose a "Council" that meets annually to exchange information of common interest
 
 
 [5]
 The questions, while not identical in all cases, covered the following matters: (1) each outsider's name, address, and at what plant he was employed; (2) if he was in the local union; (3) if he was a member of another union and if he held an office in that union; (4) who he was present to represent the local union or another one; (5) what was his role and purpose in the present negotiations; (6) had he had any prior involvement with the local union; and (7) by what process or authority he was invited to the negotiations
 
 
 [6]
 Robinson acknowledged that, in the past, union attorneys had participated in bargaining sessions held on the plant premises
 
 
 [7]
 The outsiders had to resort to various means simply to attend the opening sessions: switching shifts, sending union officials already on vacation, or attending without leave
 
 
 [8]
 When the Baltimore plant manager denied Donnellon's vacation leave request on October 13, he also informed Donnellon that the Port Ivory bargaining session scheduled for October 15 had been cancelled. The Port Ivory union did not even learn of the cancellation until October 14
 
 
 [9]
 Subsection 8(d) of the Act, 29 U.S.C. § 158(d), provides in pertinent part that
 to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times, and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, ....
 
 
 [10]
 The employer has a corresponding right in subsection 8(b)(1)(B) of the Act, 29 U.S.C. § 158(b)(1)(B)
 
 
 [11]
 "Coordinated bargaining is a negotiating technique whereby a union coordinates its bargaining with other unions or other bargaining units by including on its negotiating panel members of such other unions or bargaining units." Indiana & Michigan Elec., 599 F.2d at 190 n.4. The resulting contract is only for one union or unit
 
 
 [12]
 Complete copies of the other agreements were not included in the Joint Appendix so it is impossible to determine whether or not they contain personal leave provisions
 
 
 [13]
 Procter & Gamble also seeks to distinguish Indiana & Michigan Electric because there was a history of travelers participating in contract negotiations and there was no union business leave provision in the parties' contracts. We see no significance in these distinctions
 
 
 [14]
 The Board also discredited McIntire's testimony that he would have signed a single instrument on February 4, even if it also contained the outsiders' signatures
 
 
 [15]
 In addition to crossing out the space in order to prevent all the union negotiators from signing, Millsap placed the following notation on the contract: "The Union President was offered the opportunity to sign the Agreement and refused to sign." (Jt.App. at 702.)
 
 
 [16]
 One of the negotiators was no longer a Procter & Gamble employee; the other declined to sign
 
 
 [17]
 Subsection 8(c), 29 U.S.C. § 158(c), provides:
 The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.
 
 
 [18]
 Procter & Gamble also suggests that Sharfe's threats were not authorized and, therefore, it is not responsible for them. Under the National Labor Relations Act, employer responsibility for a supervisor's acts is not determined by strict rules of agency law. Subsection 2(13) of the Act, 29 U.S.C. § 152(13). Rather, the employer is responsible when "employees would have just cause to believe that (a supervisor) was acting for and on behalf of the company." NLRB v. Texas Independent Oil Co., 232 F.2d 447, 450 (9th Cir. 1956). Accord, Dover Corp., 535 F.2d at 1210 (10th Cir.); Trey Packing, Inc. v. NLRB, 405 F.2d 334, 338 (2d Cir. 1968); NLRB v. Garland Corp., 396 F.2d 707, 709 (1st Cir. 1968). Considering Sharfe's position as a plant manager and his role in previous contract negotiations, the Port Ivory union officials would be justified in believing that he spoke for Procter & Gamble
 
 
 [19]
 Procter & Gamble also objects because the earlier charges did not specify an 8(a)(3) violation. This does not prevent Board consideration of the March suspension. What is crucial is that the complaint, not the charge, notify the employer of the charges against him, I.U.O.E., Local 925, 460 F.2d at 596, and even that need not be specific. Owens-Corning Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1361 (4th Cir. 1969); NLRB v. Pecheur Lozenge Co., 209 F.2d 393, 402 (2d Cir. 1953); American Newspaper Publishers Ass'n v. NLRB, 193 F.2d 782, 800 (7th Cir. 1951), aff'd 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852 (1953). In this case, however, the consolidated amended complaint did allege the March suspension as a subsection 8(a)(3) violation and the Board, therefore, properly addressed this allegation on its merits
 Procter & Gamble also cites several cases for the proposition that events occurring after the original charge is filed and more than six months prior to the filing of an amended charge are barred by subsection 10(b). NLRB v. Newton, 214 F.2d 472, 474-75 (5th Cir. 1954); Indiana Metal Products Corp. v. NLRB, 202 F.2d 613, 618-19 (7th Cir. 1953). These cases are inapposite for two reasons. First, they deal with amended charges encompassing prior events; this case addresses including subsequent events within prior charges. Second, these cases were decided before Fant Milling and did not apply its test for determining the inclusion of subsequent events; to this extent, they are unpersuasive.
 
 
 [20]
 A charge filed April 5, 1977, specifically covered the above conduct, but subsequently was withdrawn without prejudice and never reinstated
 
 
 [21]
 29 C.F.R. § 102.33(a) (1980) provides in pertinent part that
 (w)henever the general counsel deems it necessary in order to effectuate the purposes of the act or to avoid unnecessary costs or delays, he may ... order that (a) charge and any proceeding which may have been initiated with respect thereto:
 ....
 (3) Be transferred to and continued in any other region for the purpose of investigation or consolidation with any proceeding which may have been instituted in or transferred to such other region; ....
 
 
 [22]
 Procter & Gamble contends that the notice requires it to meet and bargain collectively with union bargaining committees including outsiders even though the Board specifically found that Procter & Gamble did not refuse to bargain. Read in light of the accompanying order, Procter & Gamble must cease and desist from refusing to bargain with the unions by engaging in the unlawful conduct found by the Board in this case. Thus this contention is without merit
 
 
 [23]
 The General Counsel excepted to the ALJ's failure to award backpay for negotiators and Procter & Gamble briefed and argued this issue before the Board. Before this court, the Board now contends that because Procter & Gamble failed to file a petition for reconsideration of this affirmative relief with the Board, 29 C.F.R. § 102.48(d)(1), it cannot assert any objection absent extraordinary circumstances which are not present in this case. Subsection 10(e) of the Act, 29 U.S.C. § 160(e); ILGWU v. Quality Mfg. Co., 420 U.S. 276, 281 n.3, 95 S.Ct. 972, 975 n.3, 43 L.Ed.2d 189 (1975); NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 322, 82 S.Ct. 344, 347, 7 L.Ed.2d 312 (1961). Because this issue was briefed and argued to the Board, there is sufficient compliance with subsection 10(e). NLRB v. Annapolis Emergency Hosp. Ass'n, 561 F.2d 524, 527 (4th Cir. 1977). Accordingly, we will address this objection on the merits
 While the remedy of ordering Procter & Gamble to reimburse the unions for their share of the rental cost of alternative meeting facilities apparently was not fully litigated before the Board as such, both the General Counsel and Procter & Gamble litigated the ALJ's finding that Procter & Gamble violated the Act by refusing to make its plant premises available for bargaining. Accordingly, we also will address this modified remedy on its merits.